## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **JOHN DOE and JANE DOE, as** | ) | |
| **Parents and Next Friends of** | ) | |
| **D.M., a minor,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 11-3355** |
| | ) | |
| **CHAMPAIGN COMMUNITY UNIT** | ) | |
| **4 SCHOOL DISTRICT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Before the Court is the Defendants' Motion for Summary Judgment (d/e 55).  The motion is GRANTED in part and DENIED in part.  Questions of material fact prevent granting summary judgment on the Plaintiffs' claims against Rhonda Howard, but summary judgment is granted on the Plaintiffs' claims against the members of the school board.

## I.  BACKGROUND

This case arises out of a search conducted by Defendant Rhonda Howard on D.M., the then-16-year-old son of Plaintiffs

John and Jane Doe, while D.M. was a student at Academic Academy in Champaign, Illinois, and Howard was the principal there.  On the morning of January 21, 2011, Principal Howard was informed by a staff member that there was a strong marijuana odor present in the hallway outside of Room 113.  Howard dep., d/e 66 at 13.  Principal Howard entered Room 113 at around 9:00 AM.  Id. at 17.  School started at 9, but there were only four students in the room at that time.  Id. at 17-18.  Principal Howard spoke with those four students, but she did not feel that they were the source of the marijuana smell.  Id.  Principal Howard then left Room 113 to check the neighboring Room 112 for the marijuana smell.  Id. at 18.  When she could not locate the smell there, she went on to check other areas of the school.  Id.

The parties differ on when they believe D.M. arrived at school on January 21, 2011.  Principal Howard states that D.M. arrived by 9:15, while D.M. remembers getting to school at 9:30.  Compare Howard dep., d/e 66 at 12, with D.M. Dep., d/e 61 at 32.  D.M. entered Room 113, where he had his first class of the day, hung up his coat on a hook near the door, and sat in the front row in the seat closest to the door.  D.M. Dep., d/e 61 at 34.  By this time,

Principal Howard had finished checking the rest of the school and she returned to Room 113. Howard dep., d/e 66 at 19. When she entered the room, she smelled a strong marijuana smell by the front door. Id. at 19-20. After walking around the room, she decided that D.M.'s coat was the source of the smell. Id. at 20. She did not initially know who owned the coat, but when she asked whose coat it was, D.M. identified it as his coat. Id. at 20-21. Principal Howard then observed the class for several minutes and claims to have observed that D.M. had "droopy, puffy" eyes and that he was laughing and giggling. Id. at 21. Based on her observations of D.M., Principal Howard asked D.M. to accompany her to her office. Howard dep., d/e 66 at 21.

The Plaintiffs dispute that there was any smell on D.M.'s coat, Jane Doe dep., d/e 62 at 15, that D.M.'s eyes were red, D.M. Dep., d/e 61 at 67, and that D.M. was laughing or giggling, id. at 68. The Plaintiffs concede that D.M.'s eyes may have been puffy or droopy but state that this appearance was caused by lack of sleep and the fact that D.M. had woken up recently. D.M. Dep., d/e 61 at 68. D.M. also states that Principal Howard did not walk around Room 113 before pulling D.M. out of class and that she instead asked him

to step out immediately after she came into the class.  Id. at 77.

After asking D.M. to step out of the class, Principal Howard took D.M.'s backpack and coat with her, and D.M. followed Principal Howard to her office.  Howard dep., d/e 66 at 21; D.M. Dep., d/e 61 at 44.  When they got to Principal Howard's office, Principal Howard told D.M. that she had pulled him out of class because he was high.  Howard dep., d/e 66 at 25; D.M. Dep., d/e 61 at 44.  D.M. responded by either laughing or smirking and told Principal Howard that he did not smoke marijuana.  D.M. Dep., d/e 61 at 44-45, 78.  He also told Principal Howard that fatigue could have caused him to have droopy eyes and given the impression that he was high, but he reiterated that he was not actually high.  Id. at 45.

Principal Howard then told D.M. that she was going to conduct a search for marijuana.  Howard dep., d/e 66 at 27; D.M. dep., d/e 61 at 44-45.  She began the search by having D.M. empty out his pockets while she searched D.M.'s coat and backpack.  Howard dep., d/e 66 at 27-28, 31; D.M. Dep., d/e 61 at 45-47.  Principal Howard emptied out the pockets of the coat and felt down the lining, looked through D.M.'s backpack, and placed the contents of

the coat and bag on her desk.  Howard dep., d/e 66 at 28-29; D.M. Dep., d/e 61 at 45-47.  After D.M. pulled out the pockets of his jeans to show Principal Howard that his pockets were empty, Principal Howard pulled on the inside-out pockets to make sure the pockets were fully pulled out.  D.M. Dep., d/e 61 at 48.  Principal Howard then asked D.M. to remove his shoes, and she looked over the inside and outside of the shoes.  Howard dep., d/e 66 at 32; D.M. Dep., d/e 61 at 46, 49.  She also had D.M. roll down his socks and pull up his pant legs so she could see if D.M. was hiding anything in his socks.  Howard dep., d/e 66 at 32-33; D.M. Dep., d/e 61 at 46.

The parties dispute what happened next.  D.M. states that Principal Howard had him unbuckle his belt and roll down the top of his jeans so that the top of his underwear was exposed.  D.M. Dep., d/e 61 at 50.  She then had him remove his shirt, and she walked around him to see if he was hiding anything in his waistband or boxers.  Id. at 49-51.  Principal Howard states that she had D.M. "raise" his shirt so that she could see his waistline, Howard dep., d/e 66 at 58, but she also states that having a student roll down the top of his pants or lift up his shirt to expose

his midsection would exceed her authority to search a student, <u>id.</u> at 54, and she denies that she had him take his shirt off, <u>id.</u> at 70. D.M. and Principal Howard also dispute whether Principal Howard's assistant was present for the search or whether the assistant did not enter Principal Howard's office until after Principal Howard had finished searching D.M. <u>Compare</u> Howard dep., d/e 66 at 24-25, <u>with</u> D.M. Dep., d/e 61 at 53.

Principal Howard did not find any contraband on D.M., and after she finished searching him, she walked him back to class. Howard dep., d/e 66 at 34-35; D.M. Dep., d/e 61 at 53-54. Principal Howard did not search any of the other students in D.M.'s class. D.M. dep., d/e 61 at 64; Jane Doe dep., d/e 62 at 22; John Doe dep., d/e 63 at 29. D.M. stated that Principal Howard also did not sniff any students other than D.M. and the only other African-American student in class. D.M. dep., d/e 61 at 55. After walking D.M. back to class, Principal Howard called D.M.'s mother, Plaintiff Jane Doe. Howard dep., d/e 66 at 36; Jane Doe dep., d/e 62 at 23. Principal Howard told Ms. Doe about the search of D.M., but at that point, Principal Howard did not give Ms. Doe any details about the search, and she did not tell Ms. Doe that no other students had

been searched.  Howard dep., d/e 66 at 36; Jane Doe dep., d/e 62 at 23.  At lunchtime, D.M. called his mother and told her how upset he was because of the search.  D.M. dep., d/e 61 at 70; Jane Doe dep., d/e 62 at 17-18, 20-21.  Ms. Doe then called Principal Howard back and requested a meeting to discuss the search with her.  Jane Doe dep., d/e 62 at 25.

The weekend after the search occurred, D.M. travelled to Chicago to spend time with his father.  John Doe dep., d/e 63 at 15; D.M. dep., d/e 61 at 72.  D.M. was noticeably upset after the search, and he spoke to some religious mentors about what had happened.  John Doe dep., d/e 63 at 15-16, 27-28; D.M. dep., d/e 61 at 72.  Later, D.M. sought counseling with the school counselor. D.M. dep., d/e 61 at 73-74.

The Plaintiffs met with Principal Howard on January 25, 2011—the Tuesday after the search, which had occurred on a Friday.  John Doe dep., d/e 63 at 24.  Present at the meeting were Ms. Doe and her brother (D.M.'s uncle), Principal Howard, and Orlando Thomas, a representative of the School Board.  Jane Doe dep., d/e 62 at 26.  D.M.'s father, Plaintiff John Doe, was present by telephone.  Id. at 26; John Doe dep., d/e 63 at 17.  D.M.'s

teacher and Principal Howard's assistant were also at the meeting. D.M. dep., d/e 61 at 77.  The parties dispute what occurred during the meeting.  John and Jane Doe allege that Principal Howard acknowledged that she did not smell marijuana on D.M. when they got to her office. John Doe dep., d/e 63 at 22; Jane Doe dep., d/e 62 at 34.  Principal Howard disputes that she told the Plaintiffs that she did not smell marijuana on D.M. in her office, and she testified that she did still smell marijuana on D.M.'s coat when they reached her office.  Howard dep., d/e 66 at 36, 41-42.  The Plaintiffs also stated that, after D.M.'s uncle questioned Principal Howard about the grounds for her search, she could not offer an explanation for why she searched D.M. and she eventually broke down in tears and apologized.  D.M. dep., d/e 61 at 85-87; John Doe dep., d/e 63 at 18, 23; Jane Doe dep., d/e 62 at 28, 32-33.  They further allege that Orlando Thomas admitted that Principal Howard had made mistakes in her search of D.M. and that he stated would review the school's search policy with her.  D.M. dep., d/e 61 at 87-88; John Doe dep., d/e 63 at 18, 24; Jane Doe dep., d/e 62 at 28, 33, 36. Principal Howard acknowledges apologizing to the Plaintiffs, but she testified that the apology was "for the way the parents felt," not

necessarily for what Principal Howard had done. Howard dep., d/e 66 at 42, 70.

On September 20, 2011, Mr. and Ms. Doe filed suit against Principal Howard, Champaign Community Unit 4 School District, the Superintendent of Champaign Community Unit 4 School District, and all of the members of the Board of Education of Champaign Community Unit 4 School District ("the Board"). Compl., d/e 1. The Plaintiffs' complaint has faced two motions to dismiss and has been amended twice. In ruling on those motions to dismiss, the Court dismissed claims against Principal Howard in her official capacity and claims against the Board because the Court found that the Plaintiffs had not shown any wrongdoing on the part of the Board. See Op. of July 12, 2013, d/e 33. The latest version of the Plaintiffs' complaint brings § 1983 claims against Principal Howard for violations of D.M.'s Fourth Amendment rights "not to be apprehended or taken into possession or custody" and "not to be subjected to unreasonable searches and seizures," as well as his Fifth and Fourteenth Amendment "right not to be deprived of life, liberty, or property without due process of law." Sec. Am. Compl., d/e 34 at 7-8. The Second Amended Complaint also brings

a § 1981 claim against Principal Howard for violating D.M.'s "right not to be racially profiled." Id. at 8-10. Lastly, the Plaintiffs bring a §1983 claim against the Board that is largely the same as the claim that the Court previously dismissed. Compare id. at 10-12 with First Am. Compl., d/e 28 at 13-14. The Defendants now move for summary judgment against the Plaintiffs' claims on the grounds that Principal Howard is entitled to qualified immunity and summary judgment against the Plaintiffs' §§ 1983 and 1981 claims and that the Board is entitled to summary judgment on the Plaintiffs' § 1983 claim against the Board. Defs.' Mot. for Summ. J., d/e 55.

## II. **LEGAL STANDARDS**

Summary judgment is appropriate where the record, viewed in the light most favorable to the nonmovant, reveals that there are no genuine issues as to any material fact, meaning that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); Trentadue v. Redmon, 619 F.3d 648, 652 (7th Cir. 2010) (noting that all reasonable inferences must be drawn in favor of the nonmovant). The party moving for summary judgment bears the burden of establishing the absence of any genuine issues of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Once the movant has met this burden, the nonmovant must

present evidence sufficient to create triable issues of fact on each of

the essential elements of her claim.  Trentadue, 619 F.3d at 652.

The court simply determines whether there is a genuine issue of

fact for trial without weighing the evidence or evaluating the

credibility of the parties and witnesses.  Outlaw v. Newkirk, 259

F.3d 833, 837 (7th Cir. 2001).

In addition to moving for summary judgment against the

Plaintiffs' claims, the Defendants argue that Principal Howard is

entitled to qualified immunity against the Plaintiffs' claims.  State

actors are entitled to qualified immunity where their conduct does

not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.  Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982) (providing that qualified

immunity protects governmental actors from liability for civil

damages).

The court applies a two-part inquiry to determine whether a

defendant is entitled to qualified immunity.  First, the court

examines whether the plaintiff has presented evidence, taken in the

light most favorable to the plaintiff, that would allow a reasonable fact finder to determine that the plaintiff was deprived of a constitutional right.  Sallenger v. Oakes, 473 F.3d 731, 739 (7th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Second, the court examines whether the particular constitutional right was clearly established at the time of the alleged violation.  Id. A court may, in its discretion, address the second prong of the test first.  Pearson, 555 U.S. at 242.

The plaintiff bears the burden of establishing the existence of a clearly established constitutional right.  Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993).  A plaintiff may do this by either pointing to a closely analogous case or showing that the conduct was so egregious that no reasonable officer would have thought he was acting lawfully.  Chelios v. Heavener, 520 F.3d 678, 691 (7th Cir. 2008); Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 723-24 (7th Cir. 2013).  "Importantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense."  Abbott, 705 F.3d at 731.  However, "a case directly on point is not required for a right to be clearly established and 'officials can

still be on notice that their conduct violates established law even in novel factual circumstances.'" Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 528 (7th Cir. 2012) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

## III.  **ANALYSIS**

The Defendants argue that Principal Howard is entitled to qualified immunity and summary judgment against the Plaintiffs' claims because her search of D.M. "was justified at its inception and permissible in its scope."  Defs.' Mot. for Summ. J., d/e 55 at 1-2.  The Defendants also move for summary judgment against the Plaintiffs' claim against the Board because, they argue, the Plaintiffs cannot present any evidence to show that the Board acted with "deliberate indifference" to D.M.'s rights.  Id. at 2.

### A. **Viewing the Record in the Light Most Favorable to the Plaintiff, a Jury Could Find that Principal Howard's Search Violated D.M.'s Constitutional Rights.**

The Defendants argue that Principal Howard's search was constitutional because Principal Howard had reasonable grounds to search D.M. and her search was reasonable in its scope.  However, when the facts are construed in the light most favorable to the Plaintiffs, a jury could find that Principal Howard violated D.M.'s

rights by either commencing a search without reasonable suspicion or carrying out a search that was unreasonable in scope.

First, Principal Howard may have violated D.M.'s constitutional rights by searching him without reasonable suspicion. The Supreme Court has held that a search of a student must be "'justified at its inception'" by showing that "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." New Jersey v. T.L.O., 469 U.S. 325, 341-42 (1985) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). In other words, a school official must have "a moderate chance of finding evidence of wrongdoing" before searching a student. Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009).

The facts in the light most favorable to the Plaintiffs are that D.M. did not giggle or laugh in class, that his eyes were not red, that his coat did not smell like marijuana when Principal Howard got to her office with him, and that he simply looked "sleepy." D.M. dep., d/e 61 at 67-68; John Doe dep., d/e 63 at 22; Jane Doe dep., d/e 62 at 34. The Plaintiffs' version of what transpired at the parent meeting with Principal Howard also demonstrate that

Principal Howard was not able to explain her reasons for searching D.M. at the time of the search.  See D.M. dep., d/e 61 at 85-87; John Doe dep., d/e 63 at 18, 23; Jane Doe dep., d/e 62 at 28, 32-33.  The first coherent justification that Principal Howard offered for her search of D.M. appears to be in the statement she wrote a week to a week and a half after she searched D.M., which was also after she met with D.M.'s parents.  See Howard statement, d/e 64; Howard dep., d/e 66 at 43.  Under these facts, a jury could find that Principal Howard lacked reasonable suspicion to commence a search of D.M.[1]

Even if Principal Howard had reasonable suspicion to begin a search of D.M., she may have violated D.M.'s constitutional rights by carrying out a search that was impermissible in scope.  In T.L.O., the Supreme Court held that a search must be "permissible in its scope" by utilizing measures that "are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." T.L.O., 469 U.S. at 342.  If a search exceeds these bounds of

---

[1]  Notably, at Principal Howard's deposition, Principal Howard did not appear to understand what reasonable suspicion meant.  See Howard dep., d/e 66 at 48.

reasonableness, it "crosses the constitutional boundary." Safford, 557 U.S. at 382 (Ginsburg, J., concurring in part and dissenting in part). The Supreme Court applied its T.L.O. holding in the context of strip searches in Safford Unified School District No. 1 v. Redding. In Safford, the Court analyzed the constitutionality of the search of a 13-year-old female student by several school officials. Safford, 557 U.S. at 368-69. The student was suspected of distributing prescription-strength ibuprofen to her classmates. Id. at 368. The school officials required the student to remove all of her outer clothes and "pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree." Id. at 369.

In evaluating the constitutionality of this search, the Supreme Court recognized that the school's interest in preventing the distribution of prohibited substances, combined with the officials' reasonable suspicion that the student had distributed the prohibited pills, justified a search of the student's backpack and outer clothing. Id. at 373-74. However, the Court closely scrutinized the school's justifications for the more intrusive strip search and held that when "the categorically extreme intrusiveness

of a search down to the body of an adolescent" is involved, "general

background possibilities [of finding contraband] fall short; a

reasonable search that extensive calls for suspicion that it will pay

off." Id. at 376-77. The Court concluded that the ibuprofen pills

did not present a significant threat to students and, importantly,

that the school officials lacked "any reason to suppose that [the

student] was carrying pills in her underwear." Id. The Court

emphasized that:

> We do mean . . . to make it clear that the T.L.O. concern
> to limit a school search to reasonable scope requires the
> support of reasonable suspicion of danger or of resort to
> underwear for hiding evidence of wrongdoing before a
> search can reasonably make the quantum leap from
> outer clothes and backpacks to exposure of intimate
> parts. The meaning of such a search, and the
> degradation its subject may reasonably feel, place a
> search that intrusive in a category of its own demanding
> its own specific suspicions.

Id. The Court ultimately held that the search was impermissible

but that its impermissibility was not clearly established at the time

of the search, meaning that the school officials were entitled to

qualified immunity. Id. at 377-79.

A jury could find that Principal Howard's search of D.M. was

impermissible in scope. The Defendants are correct that marijuana

presents a greater danger to D.M.'s fellow students than the prescription-strength ibuprofen at issue in <u>Safford</u>. <u>See</u> <u>Morse v. Frederick</u>, 551 U.S. 393, 394-95 (2007) (quoting <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 661 (1995)) ("[D]eterring drug use by schoolchildren is an 'important—indeed, perhaps compelling' interest").  However, as in <u>Safford</u>, Principal Howard may not have had reasonable grounds to justify what amounts to a partial strip search of D.M.  According to the Plaintiffs' version of events, Principal Howard had very little reason to suspect D.M. for marijuana use, and yet she had D.M. remove his shirt, unbuckle his belt, and roll down the top of his pants so that the top of his underwear was visible.  One of Principal Howard's major reasons for the search—the smell on D.M.'s jacket—could hardly be used to justify a search of D.M.'s naked upper body and the waistband of his underwear, especially if, as the Plaintiffs allege, Principal Howard no longer smelled marijuana on D.M. once they reached Principal Howard's office.  Without the marijuana smell to justify her search, all Principal Howard had to justify her search was D.M.'s "sleepy"-looking eyes.  The Court finds that under the scrutiny required by <u>Safford</u>, the appearance of D.M.'s eyes, without

more, does not amount to a specific reason "to suppose that [D.M.] was carrying [marijuana] in [the waistband of his] underwear."  See Safford, 557 U.S. at 376-77.

### B.  The Rights that Principal Howard May Have Violated Were Clearly Established.

Furthermore, Principal Howard is not entitled to qualified immunity because the rights she may have violated were clearly established.  T.L.O. and Safford clearly established that a search of a student carried out without reasonable suspicion of wrongdoing, or "a moderate chance of finding evidence of wrongdoing," is unconstitutional.  See T.L.O., 469 U.S. at 341-42; Safford, 557 U.S. at 371.  Therefore, if a jury found that Principal Howard lacked reasonable grounds to begin searching D.M., Principal Howard would not be entitled to qualified immunity against D.M.'s claim that the search was unreasonable at its inception.

Additionally, the exacting standard set by Safford put Principal Howard on notice that her search of D.M. could have been impermissible in scope.  Principal Howard had actual notice of this standard because she was provided with the school's strict regulations on searches and with information about the state of the

law on school searches.  See Ex. E to Defs.' Mot. for Summ. J., d/e 57-2; Howard dep., d/e 66 at 47-53 (testifying that an assistant superintendent reviewed this information with Principal Howard). This information summarized the holdings of T.L.O. and Safford, stating that "[u]nless school officials have reasonable particularized suspicion with respect to the suspect and the item school officials are looking for presents and immediate threat to the safety of school personnel or students a strip search is unconstitutionally invasive." Ex. E to Defs.' Mot. for Summ. J., d/e 57-2.  The Court finds that the facts in Safford are sufficiently analogous to this case to put Principal Howard on notice for the purposes of qualified immunity. See Phillips, 678 F.3d at 528 (7th Cir. 2012) (quoting Hope, 536 U.S. at 741) ("[A] case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'").[2]

    The cases cited by the Defendants do not alter this analysis.

---

[2] On this point, the Court disagrees with the holding of the District of Kansas in S.S. ex rel. Sandidge v. Turner Unified Sch. Dist. #202, No. 12-CV-02346-CM, 2012 WL 6561525, at *4-5 (D. Kan. Dec. 14, 2012).  The Court agrees with the Sandidge court's factual analysis, but feels that the court erred in requiring a more factually analogous case than Safford to find that there had been a violation of a clearly established right in that case.

Several of the Defendants' cited cases only involve searches of outer clothing, as opposed to the more intrusive sort of search alleged by the Plaintiffs in this case.  See <u>Bridgman By & Through Bridgman v. New Trier High Sch. Dist. No. 203</u>, 128 F.3d 1146, 1149 (7th Cir. 1997) (search of student's outer clothing); <u>Faber v. Monticello Cent. Sch. Dist.</u>, No. 10-CV-01812 ER, 2013 WL 2450057, at *4 (S.D.N.Y. June 6, 2013) (search of student's pockets); <u>Binder v. Cold Spring Harbor Cent. Sch. Dist.</u>, No. CV 09-4181 SJF ARL, 2010 WL 3257708, at *6 (E.D.N.Y. July 19, 2010) (search of student's pockets and backpack).  Similarly, <u>Gallimore v. Henrico County School Board</u>, 38 F. Supp. 3d 721, 725 (E.D. Va. 2014), concerned a pat down search, which generally does not reach the intrusiveness of a strip search.  See <u>United States v. Dorsey</u>, 641 F.2d 1213, 1217 (7th Cir. 1981) ("[A] patdown search, which falls short of the intrusiveness associated with a strip search, is governed by principles different from those applicable to strip searches").  Furthermore, the court in <u>Widener v. Frye</u>, 809 F. Supp. 35, 38 (S.D. Ohio 1992), did not scrutinize the justifications for a school's very intrusive search of a student.  School officials in <u>Widener</u> felt that a student was acting "sluggish" and possibly

smelled like marijuana, and they required him to lift his shirt, lower his pants, and pull his gym shorts "tight around his crotch area to permit the Defendants . . . to observe whether the Plaintiff was concealing any drugs." Id. at 36. Given the intrusiveness of this search and the limited grounds to justify it, the Widener decision would likely be reversed under Safford's exacting standard.

The school in Cornfield by Lewis v. Consolidated High School District No. 230, 991 F.2d 1316 (7th Cir.1993), which required a student to strip naked for a search, had substantially greater justifications to support such an invasive search. See Cornfield, 991 F.2d at 1319, 1322. The Seventh Circuit in Cornfield recognized that "a highly intrusive search in response to a minor infraction would . . . not comport with the sliding scale advocated by the Supreme Court in T.L.O.," and that "[w]hat may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search." Id. at 1320-21. The court also observed that "no one would seriously dispute that a nude search of a child is traumatic" and that "the potential for a search to cause embarrassment and humiliation increases as children grow older"—concerns that were

implicated by Principal Howard's search of D.M.  See id. at 1321 &

n.1.  The Cornfield court acknowledged that the search of the

student was invasive, but concluded that reasonable grounds

existed for such a search because several teachers had observed

what appeared to be contraband hidden under the student's clothes

in the student's crotch area, teachers received tips from impartial

students that the student possessed and used drugs, the police had

reported to the school that the student was selling drugs to other

students, and the student previously admitted that he had sold

drugs and hidden drugs in his underwear in the past.  See id. at

1322-23.

When the facts of this case are construed in the light most

favorable to the Plaintiffs, Principal Howard had very little

justification to carry out an extensive search of D.M.  Therefore, this

case is distinguishable from Cornfield and is more analogous to

Safford.  Under Safford, the scope of Principal Howard's search may

have violated D.M.'s clearly established constitutional rights.  For

that reason, Principal Howard is not entitled to qualified immunity

on D.M.'s claim that her search was impermissible in scope.

## C. The Board Is Entitled to Summary Judgment on the Plaintiffs' § 1983 Claim.

The Defendants also move for summary judgment on the Plaintiffs' claim against the Board. The Defendants argue that the Plaintiffs cannot show that the Board failed to train Principal Howard regarding proper search procedures. The Board could be liable for Principal Howard's allegedly illegal search if the Board failed to train its employees regarding proper school search procedures and if that "'failure to train its employees . . . evidences a "deliberate indifference"' to the rights of students." See Cornfield, 991 F.2d at 1327 (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)). To impose liability on the Board, the inadequacy of Principal Howard's training must have been "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for that training. See Harris, 489 U.S. at 390.

The Board was not so indifferent in this case. As previously discussed, the Board supplied Principal Howard with a detailed pamphlet explaining the state of the law regarding school searches and an assistant superintendent went over those rules with

Principal Howard.  <u>See</u> Howard dep., d/e 66 at 47-53; Ex. E to Defs.' Mot. for Summ. J., d/e 57-2.  Such actions could hardly be considered "deliberate indifference."  Therefore, the Defendants' motion for summary judgment is granted on the Plaintiffs' claim against the Board.

### IV.  <u>CONCLUSION</u>

For those reasons, the Defendants' Motion for Summary Judgment is GRANTED on the Plaintiffs' claim against the Board and DENIED on the Plaintiffs' claims against Principal Howard. The Clerk is directed to terminate Arthur Culver, Sue Grey, Stig Lanesskog, Tom Lockman, Greg Novak, Jamar Brown, Kristine Chalifax, and David Tomlinson from this case.

ENTER: May 29, 2015.

<u>s/ Sue E. Myerscough</u>
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE
